# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

ELVIRA QUINONEZ-CASTELLANOS,

       Plaintiff,

vs.

PERFORMANCE CONTRACTORS,
INC., et al.,

       Defendants.

No. C16-4097-LTS

**MEMORANDUM OPINION AND
ORDER**

_____

## *TABLE OF CONTENTS*

| | | |
|---|---|---|
| I. | INTRODUCTION | 2 |
| II. | PROCEDURAL HISTORY | 2 |
| III. | RELEVANT FACTS | 3 |
| IV. | ANALYSIS | 9 |
| | A. Summary Judgment Standards | 9 |
| | B. Plaintiff's Sex Discrimination Claims | 10 |
| |   1. Legal Standards | 10 |
| |   2. Prima Facie Case | 12 |
| |     a. Employer's Legitimate Job Expectations | 12 |
| |     b. Facts Giving Rise to an Inference of Sex Discrimination | 12 |
| |   3. Legitimate, Non-Discriminatory Reason | 15 |
| |   4. Pretext | 16 |
| | C. Plaintiff's Retaliation Claims | 18 |
| |   1. Legal Standards | 18 |
| |   2. Prima Facie Case | 19 |
| |   3. Legitimate, Non-Retaliatory Reason | 22 |
| |   4. Pretext | 22 |
| | D. Individual Liability As To Defendants Wood and Ehlenbach | 26 |
| V. | CONCLUSION | 28 |

# I.   INTRODUCTION

This case is before me on a motion (Doc. No. 47) for summary judgment by defendants Performance Contractors, Inc. (PCI), Kendel Wood (Wood), Andrew Morel (Morel) and James Ehlenbach (Ehlenbach).   Plaintiff Elvira Quinonez-Castellanos (Quinonez) has filed a resistance (Doc. No. 50) and defendants have filed a reply (Doc. No. 63).   The parties have also completed supplemental briefing (Doc. Nos. 71 through 76).   I find oral argument is unnecessary.  *See* N.D. Ia. L. R. 7(c).

# II.   PROCEDURAL HISTORY

Quinonez commenced this action on June 2, 2016, by filing a petition (Doc. No. 3) in the Iowa District Court for Woodbury County.  Defendants removed the case to this court on July 5, 2016.  *See* Doc. No. 2.  Quinonez filed an amended complaint (Doc. No. 12) on August 9, 2016, that asserts the following counts:

I.   Retaliation in violation of the Iowa Civil Rights Act (ICRA), Iowa Code Chapter 216, against all defendants

II.   Sex discrimination in violation of the ICRA, against all defendants

III.   Retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, against PCI

IV.   Sex discrimination in violation of Title VII, against PCI

Doc. No. 12.[1]  Defendants filed their motion (Doc. No. 47) for summary judgment on July 24, 2017.  Briefing and supplemental briefing concluded on October 11, 2017.  A jury trial is scheduled to begin April 9, 2018.  *See* Doc. No. 78.

---

[1] To the extent Quinonez intended to assert hostile work environment claims under the ICRA or Title VII, she does not resist summary judgment on those claims.  *See* Doc. No. 50 at 1.

## III. RELEVANT FACTS

The following facts are undisputed except where noted otherwise:

PCI was hired by CF Industries (CF) as the general contractor to build and expand CF's fertilizer plant in Sioux City, Iowa. The project started in approximately December 2013. Quinonez was hired by PCI on May 12, 2015. She had no prior construction experience and was assigned to work as a helper on the pipefitting crew. Prior to starting her employment, Quinonez acknowledged and signed PCI's discrimination, harassment and retaliation policy. She then attended orientation training, during which time she was instructed on how to make complaints about discrimination or harassment. Pursuant to PCI's policy, an employee who has a complaint must report it to his or her supervisor or to the Human Resources (HR) department. Morel was the local field HR manager assigned to the Sioux City location. Upon receipt of a complaint of harassment or discrimination, the HR manager is required to investigate the complaint.

Quinonez was the only woman in her work group as of July 2015. She was a good worker and model employee, picking up tasks quickly and learning the various requirements of her job. In approximately August 2015, Quinonez began dating Julio Rivera, a welder who also worked for PCI on the CF project. She became pregnant with Rivera's child shortly thereafter. Rumors were circulating about her at work including: (1) she was sleeping with the majority of Jimbo Wilson's crew; (2) she was a bitch; (3) she was pregnant; (4) she did not know who the father of her unborn baby was; and (5) she was a whore.[2]

Prior to October 23, 2015, Quinonez did not go to HR to report any of the alleged rumors or harassment. She contends she did report it to John Boles (Boles), her

---

[2] Defendants argue that the rumors and any related facts are not material and should not be considered for purposes of summary judgment because plaintiff is no longer asserting a sexual harassment/hostile work environment claim. I find that they are of limited relevance regarding the basis of Quinonez's complaint of harassment and discrimination to her employer.

supervisor and foreman for PCI, but that he did not do anything about them. Quinonez alleges that before joining Boles' crew, she was told by another foreman not to pay attention to what other people were saying and to continue doing a great job.

The parties dispute whether Quinonez began experiencing disciplinary issues around the time she found out she was pregnant in October 2015. She admits that she received a verbal warning for attendance on October 6, 2015, but had no prior warnings. She also contends that she had approval from her foreman to miss work that day. There is also a disputed issue involving a rain delay on October 14, 2015. Defendants contend Quinonez received a verbal warning after disobeying a superintendent's order to return to work after a rain delay. Quinonez asserts there was miscommunication regarding when employees should have taken their break that day and that she was not disciplined in any way over this incident. The parties also dispute whether Quinonez received a verbal warning a week later for starting an altercation with an employee over money he allegedly owed her. Quinonez admits having a conversation with this co-worker over money, but denies that she was disciplined in any way over it. The superintendent told her that if there was an issue between her and the employee they needed to deal with it away from work or Quinonez could be disciplined. She states she had no further conversation with this employee at work.

PCI had a written policy requiring employees to wear color-coded hard hats in order to identify the position each employee held. The policy regarding hard hats was reviewed with all employees during orientation. The parties dispute the extent that this policy was enforced and whether it was critical to safety. Quinonez claims that workers regularly affixed stickers and decals of different sizes to various parts of their hard hats, including flags, symbols of wrenches, skulls, books, babies, animals, suns and earths, and that they were not disciplined or asked to remove them. Defendants contend the color-coding policy was an important aspect of PCI's safety protocol. Quinonez disagrees based on the alleged lack of enforcement.

In any event, pipefitters wore green hard hats and their assigned color strip was white. Quinonez disputes that these hard hats were pre-striped with white tape. She also contends no one told her to put a stripe on her hard hat and other workers did not have stripes on their hard hats. She knew that different crafts were assigned different colors of hard hats with different strips of colored tape on the side. However, she did not understand PCI's policy as it applied to other markings on hard hats.

On October 22, 2015, Quinonez came to work with a strip of red tape and a strip of white tape around the rim of her green hard hat. Boles told Quinonez that she could not have tape on her hard hat. The parties dispute what Boles said. Defendants contend he told her she could not wear any red tape on her hard hat because it indicated that she was a skilled-craft worker, such as a rigger, rather than a pipefitter helper. Quinonez contends Boles told her that she could not have tape around the rim of the hard hat. She also disputes that riggers had red tape around their hard hats. Instead, she contends that they had a rectangular strip of red tape about halfway up on each side. The parties agree that Quinonez told Boles that she was wearing the tape to represent her Mexican heritage and that Boles told her she could instead use a small sticker of the Mexican flag. Quinonez adds that Boles told her she could not have tape surrounding her hard hat, but he did not say that she could not have tape anywhere on her hard hat. Quinonez removed the tape from her hard hat.

The next day, Quinonez returned to work with tape on her hard hat, albeit in a different location. Quinonez states she had a small decoration of red and white tape on the top back of her hard hat in a "V" shape. Defendants contend Quinonez came to work with even more tape on her hard hat.[3] They agree that Quinonez spoke with Boles, and his supervisor, Wood, shortly after clocking in.

---

[3] Defendants argue that the amount and placement of tape is not relevant or material. They argue that plaintiff's refusal to adhere to the policy and her chain of command's instructions is the critical act.

The parties dispute what was said during that meeting. They agree that Boles told Wood about the tape on Quinonez's hard hat the day before, but disagree as to whether Boles issued her a warning for the incident. Defendants contend that Quinonez refused to remove the new tape decoration from her hard hat as requested by Wood. Quinonez states that she did not refuse, but asked for further explanation regarding the expectations for tape on hard hats, as she did not know red tape was not allowed anywhere on her hard hat.

The parties agree that at that time, Wood suspended Quinonez for three days for putting unapproved colored tape on her hard hat and told her that she needed to leave the jobsite to comply with the suspension. They dispute whether Quinonez refused to leave the jobsite and comply with the suspension. It is undisputed that Quinonez refused to sign the disciplinary form issued to her. Quinonez contends she asked to speak to the superintendent or someone in HR. Defendants acknowledge there was nothing inappropriate about Quinonez's request, but argue that adhering to the three-day suspension and requesting to speak to someone in HR are not mutually exclusive.

Wood contacted Ehlenbach, a superintendent, for assistance with the situation. Ehlenbach agreed that they should take Quinonez to the HR office. In the meantime, Ehlenbach contacted Morel, the HR manager. Quinonez, Wood and a female employee drove to the HR office. Wood told Ehlenbach that Quinonez refused to remove the tape from her hard hat. Safety Manager Dean Berdon (Berdon) also came to the HR office to discuss the hard hat policy. Quinonez removed the tape from her hard hat prior to Morel's arrival. Quinonez alleges that she tried to explain during this meeting that she felt like she was being treated differently than other workers, but that the others just wanted to talk about the tape. Quinonez testified that Morel and Wood stated she was being "rebellious" and "insubordinate" during this meeting.[4] Defendants contend that

_____

[4] Quinonez also spoke by phone with her brother and with Rivera during this meeting.

Quinonez then accused them of applying the hard hat policy in a racist manner. Quinonez denies making this accusation and states that she was trying to explain that she felt she was being treated differently compared to other workers in her work area and was being discriminated against.

What happened next is significantly disputed. Defendants contend that Morel was prepared to discharge Quinonez prior to any complaint of discrimination. However, after Quinonez allegedly accused them of being racist, Morel spoke with those present to determine if there was any validity to her claims. Defendants allege that based on the information Morel received, he determined that the hard hat policy was not being applied in a racist manner, that Quinonez had refused to follow her superiors' instructions and that her conduct moved beyond suspension and warranted termination due to insubordination. Defendants contend that when Morel went to tell Quinonez her employment was being terminated, she told him, for the first time, that she was the subject of rumors in the workplace. The parties agree that when Quinonez brought up the rumors, Morel asked her to put her allegations in writing. Morel then terminated Quinonez's employment.

Quinonez asserts that Morel did not decide to terminate her employment until after she submitted, and he reviewed, her written complaint of discrimination and harassment. She points out that there is no physical evidence to establish when Morel made the decision to terminate her employment. She further notes that Morel did not write any statements regarding this incident until February 1, 2016, more than three months after her employment was terminated and she had filed a complaint with the Iowa Civil Rights Commission. Quinonez denies that she informed Morel of any rumors prior to completing her written statement. She states that she attempted to talk about the harassment and discrimination, but the others kept redirecting the discussion back to the tape. She contends that she did not tell Morel anything about the discrimination and harassment before completing her written statement. The parties agree that Morel did

not know why Quinonez refused to leave the jobsite upon being suspended and that he did not ask her why. Defendants argue this is not material.

With regard to defendants Wood and Ehlenbach, Quinonez contends that she complained of discrimination and harassment to them before they met with Morel. She also complained that Wood had participated in the harassment by spreading sexual rumors about her. She alleges that Wood and Ehlenbach were untruthful with Morel by reporting she refused to leave the jobsite when, according to her, she did not leave the premises because she wanted to speak to someone in HR first.

Defendants assert that Morel had Quinonez complete a statement so that it could be investigated. Quinonez disputes that Morel intended to conduct an investigation into her harassment and discrimination complaints. She notes that he took immediate action to get witness statements with regard to the hard hat incident, but took no action in response to her complaints of harassment and discrimination that she provided that same date. She contends it was not until 13 or 14 days after she made her complaint that PCI took any action. She states this was after she repeatedly called the corporate HR office and reached corporate HR manager Sarah Borne to request that PCI investigate her complaint. PCI does have a formal procedure for investigating complaints, but defendants state it is outdated and not followed.

PCI eventually sent a recruiter, Lance Covington, to investigate, but he did not follow up on any information contained in witness statements, ask for more specific information or take any further action on Quinonez's complaint. PCI contends that it took approximately three weeks for it to interview eight witnesses, review statements and inform Quinonez her claims were unfounded. Quinonez argues Covington's investigation took two days – November 5 and 6, 2015. Quinonez also disputes that her claims were "unfounded," stating that seven of the eight employees confirmed there were rumors circulating about her. Finally, she notes, and defendants admit, that Morel has been involved in at least two other situations in which a PCI employee claimed he was

8

discharged in retaliation for complaining of discrimination or harassment.

## IV.    ANALYSIS

### A.    Summary Judgment Standards

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of

the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## B.      *Plaintiff's Sex Discrimination Claims*

### 1.      *Legal Standards*

"Under federal law, an employer may not 'discharge any individual, or otherwise . . . discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." *Liles v. C.S. McCrossan*, 851 F.3d 810, 821 (8th Cir. 2017) (quoting 42 U.S.C. § 2000e-2(a)(1)). The same analysis applies to Quinonez's claim under the ICRA. *See Tenge v. Phillips*

10

*Modern Ag Co.*, 446 F.3d 903, 907 n.3 (8th Cir. 2006). "Plaintiffs may prove discrimination in Title VII claims in two ways: with direct evidence as in the *Price Waterhouse* approach, or with indirect evidence as in the *McDonnell Douglas* analysis." *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1042 (8th Cir. 2005). Direct evidence is evidence that "must be strong enough to show a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employment decision." *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 965 (8th Cir. 2006).

If there is no direct evidence of discrimination, a plaintiff may "creat[e] an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *McGinnis v. Union Pacific R.R.*, 496 F.3d 868, 873 (8th Cir. 2007). To establish a prima facie case of sex discrimination under this framework, the plaintiff must show that she: "(1) is a member of a protected class; (2) was meeting her employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated employees who were not members of her protected class."[5] *Rebouche v. Deere & Co.*, 786 F.3d 1083, 1087 (8th Cir. 2015). A prima facie case "creates a presumption of unlawful discrimination, which in turn requires a defendant to come forward with evidence of a legitimate, nondiscriminatory reason for the defendant's actions." *McGinnis*, 496 F.3d at 873. "If the defendant articulates such a reason, the burden returns to the plaintiff to show the defendant's proffered reason is pretextual." *Id.*

---

[5] The fourth element is sometimes broadly phrased as "facts that give rise to an inference of gender discrimination." *See Holland v. Sam's Club*, 487 F.3d 641, 644 (8th Cir. 2007).

### 2.    *Prima Facie Case*

Defendants do not contest the first or third elements of Quinonez's prima facie case but contend that her case fails on the second and fourth elements – whether she was meeting her employer's legitimate job expectations and whether there are facts giving rise to an inference of sex discrimination.

### a.    *Employer's Legitimate Job Expectations*

With regard to the second element of the prima facie case – whether Quinonez was meeting PCI's legitimate job expectations – defendants allege Quinonez received three disciplinary actions over a 16-day period.  Quinonez disputes that the alleged disciplinary actions happened.  She also argues that this element requires only a showing that she was qualified to perform the job, not whether she was performing it satisfactorily.

I agree with Quinonez.   In this context, it is error to require a plaintiff to demonstrate a fact issue as to whether "[s]he was performing [her] job at the level that met the employer's legitimate expectations."  *Riley v. Lance, Inc.*, 518 F.3d 996, 1000 (8th Cir. 2008).  A plaintiff need only show that he or she was "otherwise qualified" for the position held.  *Id.*  There is no dispute that Quinonez was qualified for her position as a helper with the pipefitting crew.  *See* Doc. No. 63 (undisputed that Quinonez was "a very good worker and a model employee" and that she "picked up on her job tasks very well.").  Therefore, she has established the second element of her prima facie case.

### b.    *Facts Giving Rise to an Inference of Sex Discrimination*

With regard to the fourth element, defendants rely on their allegations that Quinonez refused to remove the tape from her hard hat while other employees did so.  They point to evidence that one other individual was asked to remove tape from his hard hat and that when he refused, his employment was also terminated.  Quinonez argues the facts of that situation differ from hers because the employee's sticker said "Fuck it" and

when asked to remove it, he used profanity, called his supervisor a "mother fucker" and had to be restrained by several employees.

Quinonez also sets forth several different bases on which she claims she was treated differently, including:

- She was subjected to sex-based rumors and discriminatory stereotypes.

- Her supervisor, Boles, knew of the rumors and did nothing to stop them

- The rumors "were explicitly sex-based and implied a sexually discriminatory view of women."

- Her male supervisors reacted to her "in a manner that demonstrates a sexually discriminatory mindset" when she asked for details regarding the hard hat policy

- She was found insubordinate for refusing to leave the jobsite, when, in fact, she had simply asked to talk to a superintendent or someone in HR first

- Labeling Quinonez as insubordinate for refusing to sign her three-day suspension disciplinary form when other employees frequently decline to sign them without repercussion

- The hard hat policy was applied more strictly against her compared to her male co-workers

Doc. No. 50-4 at 25-28. As noted above, Quinonez is not pursuing a claim of hostile work environment. Therefore, many of these allegations are irrelevant to a claim of sex discrimination, which requires an adverse employment action and facts giving rise to an inference of discrimination. *Compare Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016) (elements of a sexual harassment claim based on a hostile work environment include (1) plaintiff belongs to a protected group, (2) she was subject to unwelcome sexual harassment, (3) the harassment was based on sex, (4) the harassment affected a term, condition, or privilege of employment and (5) the employer knew or should have known of the harassment and failed to take proper remedial action). Moreover, conclusory

13

allegations are insufficient to defeat summary judgment. *See Boude v. City of Raymore, Missouri*, 855 F.3d 930, 935 (8th Cir. 2017). The only grounds that arguably involve an adverse employment action are the last three. *See Tademe v. Saint Cloud State University*, 328 F.3d 982, 992 (8th Cir. 2003) (noting that an adverse employment action is "exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities").

With regard to insubordination, Quinonez essentially argues that her supervisors' findings of insubordination were pretext for discrimination based on sex. She cites Wood's testimony that Quinonez was insubordinate for (1) failing to remove the tape from her hard hat as previously asked and (2) failing to leave the jobsite after receiving a three-day suspension. *See* Doc. No. 51-3 at 11-12. Wood acknowledged that Quinonez refused to leave because she wanted to speak with someone higher up and that she was taken to the HR office. *Id.* at 13-14. Quinonez also cites Boles' testimony that the only instance of insubordination was Quinonez coming to work with tape on her hard hat after she was asked to take it off. *See* Doc. No. 50-3 at 34. He acknowledged that she asked to speak to someone in HR and was taken to the HR office. *Id.* I do not find that this evidence creates an inference of discrimination based on sex as there is no evidence that Quinonez's sex factored into defendants' discipline.

With regard to the disciplinary forms, Quinonez cites Wood's testimony that he cannot recall an instance in which another employee was discharged for refusing to sign a disciplinary form, but acknowledges that other employees did refuse to sign them. *See* Doc. No. 51-3 at 13. She also cites Morel's testimony that although Quinonez did not sign the form as asked, this was not part of his decision to discharge her. *See* Doc. No. 51-1 at 19. The cited testimony does not create an inference of discrimination or demonstrate that Quinonez was treated differently when compared to "similarly situated employees who were not members of her protected class." *See Rebouche*, 786 F.3d at 1087. Indeed, the evidence Quinonez relies on makes no reference to the sex of any

employees who were not disciplined for refusing to sign the forms. Therefore, I do not find a fact issue on this alleged basis of sex discrimination.

As for the discriminatory enforcement of the hard hat policy, Quinonez has cited evidence demonstrating a genuine issue of material fact. She cites Fernando Bermudez's testimony that after Quinonez was discharged, he put red, white and blue tape representing the Cuban flag on his hard hat in the same area Quinonez had used and, in fact, applied even more tape. *See* Doc. No. 50-3 at 11. Bermudez testified that this tape was on his hard hat for several months, until he was laid off, and that no one asked him to remove the tape. *Id.* Quinonez also cites the testimony of her brother, Luis Quinonez, that the day after Quinonez was discharged he put similar tape on his hard hat and no one said anything about it. Doc. No. 51-2 at 28. Luis Quinonez further testified that he had the tape on his hard hat for a month and a half and was not disciplined. *Id.*

Based on the testimony of Bermudez and Luis Quinonez, and viewing the evidence in a light most favorable to Quinonez, I find that Quinonez has raised an issue of fact as to whether she was treated differently than similarly-situated employees who were not members of her protected class. As such, she has satisfied all four elements of her prima facie case of sex discrimination.

### 3. *Legitimate, Non-Discriminatory Reason*

Because Quinonez has established a prima facie case, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for taking adverse employment action against her. Defendants argue Quinonez was suspended, and then discharged, for insubordination. *See Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003) ("Our cases have repeatedly held that insubordination and violation of company policy are legitimate reasons for termination.") (internal quotation marks omitted)). Because insubordination is a legitimate, nondiscriminatory reason and defendants have submitted evidence to support this reason, the burden shifts back to

15

Quinonez to prove this reason was pretext. *See Kratzer*, 398 F.3d at 1046 ("This is a burden of production not proof. The defendant need not persuade the court, it must simply provide evidence sufficient to sustain a judgment in its favor.").

### 4.    *Pretext*

Quinonez must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Aulick v. Skybridge Americas, Inc.*, 860 F.3d 613, 620-21 (8th Cir. 2017) (quoting *Girten v. McRentals, Inc.*, 337 F.3d 979, 982 (8th Cir. 2003) (internal quotation marks omitted)). "[M]ore substantial evidence of discrimination is required to prove pretext, because evidence of pretext is viewed in the light of [defendant]'s legitimate, non-discriminatory explanation." *Jones v. United Parcel Service, Inc.*, 461 F.3d 982, 992 (8th Cir. 2006). To meet this burden "[a] plaintiff may show that the employer's explanation is unworthy of credence because it has no basis in fact. Alternatively, a plaintiff may show pretext by persuading the court that a prohibited reason more likely motivated the employer." *Aulick*, 860 F.3d at 621 (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc) (internal quotations marks omitted)). To do this, she may show that the employer varied from its normal policy or practice in addressing the employee's situation, *see Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 727 (8th Cir. 2001), or that the employer's proffered reason for its decision changed substantially over time. *See Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir. 1994). She could also submit "[e]vidence that similarly situated employees outside [her] class were treated differently." *Lewis v. Heartland Inns of America, L.L.C.*, 591 F.3d 1033, 1041 (8th Cir. 2010). "[T]he showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee." *Roeben v. BG Excelsior Ltd. P'ship*, 545 F.3d 639, 643 (8th Cir. 2008) (quoting *Johnson v. AT&T Corp.*, 422

F.3d 756, 763 (8th Cir. 2005)). "A plaintiff must also demonstrate 'that the circumstances permit a reasonable inference' of discriminatory animus." *Id.*

Quinonez relies on three categories of evidence to demonstrate pretext in the context of her sex discrimination claim:

- Morel's testimony that the only act of insubordination underlying his decision to discharge Quinonez was her refusal to go to the gate when she was suspended, even though Boles, Wood and Schane Roberts all acknowledged that she refused to leave because she wanted to speak with a superintendent or someone in HR, which is allowed under PCI's policies.

- PCI has changed its position over time as to the reasons it discharged Quinonez

- PCI did not discipline Bermudez or Luis Quinonez for similar tape on their hard hats

I need not address the first two categories at this time because I find that the third category is sufficient to permit a finding of pretext. Quinonez argues that similarly-situated male employees who put tape on their hard hats faced no repercussions. "At the pretext stage, the test for whether someone is sufficiently similarly situated, as to be of use for comparison, is rigorous." *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 613 (8th Cir. 2014). "The comparators need not have committed the exact same offense but must have engaged in conduct 'of comparable seriousness.'" *See Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014). "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Wierman v. Casey's General Stores*, 638 F.3d 984, 994 (8th Cir. 2011) (internal quotation marks omitted). Because Luis Quinonez had a different supervisor than did his sister, *see* Doc. No. 51-2 at 28, Bermudez is the only similarly-situated employee who may be considered.

On one hand, Bermudez arguably is an insufficient comparator because he did not

engage in similar insubordinate conduct. According to defendants, Quinonez was disciplined for coming to work with tape on her hard hat *after* she was asked to remove it and then failing to leave the jobsite when suspended. Bermudez was never asked to remove the tape from his hard hat. Therefore, there is no insubordinate conduct or discipline to directly compare to Quinonez's. *See Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013) ("Where evidence demonstrates that a comparator engaged in acts of 'comparable seriousness' but was disciplined differently, a factfinder may decide whether the differential treatment is attributable to discrimination or some other cause.").

On the other hand, however, the fact that he was not asked to remove the tape from his hard hat *at all* is evidence that could support a finding of sex discrimination. The entire scenario that led to Quinonez's discipline and discharge arose out of defendants taking issue with the tape on her hard hat. If the jury finds that Bermudez did, in fact, wear similar tape on his hard hat for several months, with no objection from defendants, such a finding would cast significant doubt on defendants' motives for raising an issue about the tape on Quinonez's hard hat. The radically-different disciplinary responses to these seemingly-identical situations could permit reasonable jurors to infer a discriminatory motive.

In sum, I find that Quinonez has put forth sufficient evidence to establish a prima facie case of sex discrimination and has demonstrated a genuine issue of material fact as to whether defendants' proffered reason for discharge was pretext for sex discrimination. Defendants' motion for summary judgment will be denied as to Counts II and IV.

## C.    *Plaintiff's Retaliation Claims*

### 1.    *Legal Standards*

Quinonez alleges retaliation under both the ICRA and Title VII. "To establish a retaliation claim under Title VII, an employee must show: (1) she engaged in protected

18

conduct; (2) a reasonable employee would have found the retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct." *Musolf v. J.C. Penney Co., Inc.*, 773 F.3d 916, 918 (8th Cir. 2014) (citing *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011)). Except with regard to the causation element, which I will address below, the elements of a retaliation claim under the ICRA are similar. *Compare Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 750 (Iowa 2006) *with Musolf*, 773 F.3d at 918. A retaliation claim is subject to the same *McDonnell Douglas* burden-shifting framework described above. *See Fiero*, 759 F.3d at 880.

### 2. *Prima Facie Case*

Defendants argue Quinonez cannot prove retaliation because she engaged in the alleged protected conduct after she was involved in the disciplinary process and cannot prove causation. The parties first dispute whether the causation test is the same under the ICRA and Title VII. They agree that a retaliation claim under Title VII requires a "but-for" test for causation. *See Jackman*, 728 F.3d at 804. However, they dispute whether the ICRA requires that the protected conduct be only a motivating factor or, instead, the but-for cause. I find that the motivating-factor (or played-a-part) test is the appropriate standard for retaliation under the ICRA. *See Haskenhoff v. Homeland Energy Solutions, L.L.C.*, 897 N.W.2d 553, 586 (Iowa 2017) (Appel, J., specially concurring for a majority of the court) ("I would thus conclude the motivating-factor or played-a-part test that applies for status-based discrimination should also apply in retaliation claims under the ICRA.").

Quinonez argues there is a fact issue, and more specifically, a credibility issue, regarding causation because the only evidence of when Morel made the decision to terminate her employment is his own testimony. The only written statement he made regarding his termination decision was created February 1, 2016, more than three months after Quinonez was fired. *See* Doc. No. 61 at 11. In both his statement and his deposition

testimony, Morel maintains that he made the decision to discharge Quinonez prior to her report of alleged harassment.[6] *See* Doc. Nos. 51-1 at 20; 51-3 at 34. Quinonez cites case law to argue that Morel's own testimony as to when he made the decision is not controlling for summary judgment purposes:

> [D]efendants contend that the initial decision to terminate plaintiff was made by [the decision maker] sometime before plaintiff's protected activity. This, they argue, undercuts a causal connection between the protected activity and plaintiff's termination. The problem with defendants' argument is that defendants have no evidence that [the decision maker] made the decision to terminate plaintiff prior to the protected activity other than [the decision maker]'s own testimony. The lack of other evidence renders this a credibility issue which the Court cannot consider. *See Quick v. Donaldson Co.,* 90 F.3d 1372, 1376-77 (8th Cir. 1996).

*Ross v. Sioux Chief Mfg. Co.*, No. 02-1173-CV-W-SWH, 2005 WL 2172002, at *11 (W.D. Mo. Sept. 7, 2005). Defendants distinguish this case by pointing out that additional evidence in *Ross* suggested that the termination decision was not final until after the plaintiff engaged in the protected activity. *Id.* Defendants also argue that "'[t]he simple fact that the employer's testimony is necessarily self-interested' is not 'enough under our previous cases to allow the jury to find that the employer's proffered reasons were pretextual.'" Doc. No. 63-1 at 15 (quoting *E.E.O.C. v. Trans States Airlines, Inc.*, 462 F.3d 987, 995 (8th Cir. 2006)).

---

[6] Defendants take issue with Quinonez's assertion in her resistance that she "never had the opportunity to orally tell Morel about the discrimination and harassment she had experienced." Doc. No. 50-4 at 15. The amended complaint alleges that Quinonez "explained to Morel that she felt the three-day suspension was discriminatory and that she had been experiencing ongoing sexual harassment at work." Doc. No. 12 at ¶ 20. She testified in her deposition that she "tried talking about how [she felt] discriminated and harassed, but they just went back to the tape and the tape and the tape and the situation again." Doc. No. 47-2 at 121. I do not find that Quinonez's statements are necessarily contradictory. If they are, they do not create a fact issue for purposes of summary judgment. *See Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995) ("We have held that a party cannot avoid summary judgment by contradicting his own earlier testimony.").

In *Trans States Airlines*, the plaintiff argued that the employer's explanation for his termination was "inherently incredible." *Id.* The court explained that "there must be some positive evidence to rebut the employer's explanation and create a genuine dispute about credibility." *Id.* Here, Quinonez cites the timing of Morel's written statement – over three months after the incident – as well as the timing of her discharge in relation to her written complaint to argue that Morel is not credible in stating he decided to terminate her employment prior to her drafting the complaint.

Defendants argue that timing alone is insufficient to support causation when a plaintiff is already in the midst of the disciplinary process. *See Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir. 2005) ("Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation.").[7] However, defendants ignore one crucial aspect of the discipline at issue here – its escalation from suspension to termination. While Quinonez complained of harassment and discrimination after receiving a three-day suspension, a more severe disciplinary action (discharge) immediately followed her complaint. Based on the temporal proximity and increased discipline, a reasonable factfinder could conclude that Quinonez's complaint was causally-related to her discharge under the stricter "but for" standard of Title VII and the "motivating factor" standard under the ICRA. I find that Quinonez has demonstrated a genuine issue of material fact as to the causation element of her prima facie case of retaliation under Title VII and the ICRA.

---

[7] "Generally, more than a temporal connection is required to present a genuine factual issue on retaliation, and only in cases where the temporary proximity is very close can the plaintiff rest on it exclusively." *Tyler v. University of Arkansas Bd. of Trustees*, 628 F.3d 980, 986 (8th Cir. 2011) (internal quotation and citation omitted). While proximity alone can be enough to establish causation for a prima facie case, it is insufficient by itself to establish pretext. *See Gibson v. Geithner*, 776 F.3d 536, 541 (8th Cir. 2015). Because the adverse action was nearly immediate following plaintiff's complaint, the inference of retaliatory motive is strong (excluding all other factors) for purposes of demonstrating a fact issue for plaintiff's prima facie case.

### 3.    Legitimate, Non-Retaliatory Reason

Defendants again cite insubordination for failing to leave the jobsite when suspended, which has been recognized as a legitimate reason for termination. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) ("Our cases have repeatedly held that insubordination and violation of company policy are legitimate reasons for termination.").

### 4.    Pretext

In light of defendants' legitimate, non-retaliatory reason, the burden shifts back to Quinonez to put forth evidence from which a reasonable jury could conclude that the employer's articulated reason for termination was pretext. *See Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 740 (8th Cir. 2017). As noted above, pretext can be established in a number of ways. For instance, a plaintiff may demonstrate the employer's proffered reason has no basis in fact, *see Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005), that the employer's proffered reason changed substantially over time, *see Korbrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir. 1994) or that the employer varied from its normal policies and practices to address plaintiff's situation. *See Erickson*, 271 F.3d at 727. "[T]he showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee." *Roeben*, 545 F.3d at 643 (quoting *Johnson*, 422 F.3d at 763). "A plaintiff must also demonstrate 'that the circumstances permit a reasonable inference' of discriminatory animus." *Id.* Strong evidence of a prima facie case may also establish pretext. *See Erickson*, 271 F.3d at 726.

Plaintiff relies on the following categories of evidence to demonstrate a fact question on whether defendants' decision to terminate her employment was pretextual:

- Morel testified that the only act of insubordination he relied on to terminate Quinonez's employment was her refusal to leave when

suspended even though Boles, Wood and Roberts knew she refused to leave only so that she could speak to HR

- Morel refused to follow PCI's complaint investigation policies regarding Quinonez's complaint of discrimination and harassment

- PCI has shifted its reasons for terminating Quinonez over time

- Other complaints of retaliatory termination have been alleged against PCI

- The temporal proximity of the complaint and the termination

Doc. No. 50-4 at 37-49. As with the discrimination claim, I need not address all of these categories because I find that the categories addressed below are sufficient to permit an inference of pretext.

An employer's failure to follow its own policies can be evidence of pretext. *See Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874-75 (8th Cir. 2010). However, "[t]he appropriate scope of investigation is a business judgment, and shortcomings in an investigation do not by themselves support an inference of discrimination." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 795 (8th Cir. 2011) (quoting *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 863 (8th Cir. 2009)). An employer "can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee or handling claims of discrimination, as long as it does not unlawfully discriminate in doing so." *Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1036 (8th Cir. 2005).

Here, Quinonez points out that PCI's "HR Investigation Procedure for Complaints" sets forth six steps which HR representatives must follow "[a]s soon as a complaint is received." *See* Doc. No. 60-1 at 8. Defendants admit that PCI has this formal complaint procedure, but state that it is outdated and is not followed. In any event, Morel admitted he did not take any immediate action with regard to Quinonez's

written complaint. Doc. No. 51-1 at 26. Borne did not learn of the complaint until Quinonez called corporate HR requesting an investigation on November 2, 2015. Doc. No. 51 at 4-5. Quinonez argues that Morel's failure to follow the complaint procedure is indicative of a retaliatory motive. She argues that a reasonable jury could conclude that Morel buried Quinonez's complaint because he had solved the problem by terminating the complainer and, therefore, he had no interest in determining whether discrimination or harassment occurred. *See* Doc. No. 50-4 at 39.

Defendants argue that PCI could reasonably conclude that Quinonez's complaint of harassment and discrimination was unfounded given that she has now dropped her sexual harassment/hostile work environment claim and that the witness statements do not confirm that she was subjected to harassing comments. They contend the witness statements demonstrate that while there were rumors at the jobsite, some were partly true and the defendants could identify only one person who spread the rumors. This person denied spreading any rumors regarding Quinonez. Defendants also argue that Morel did not ignore the complaint, but assigned the investigation to Covington after discussing it with Borne. *See* Doc. No. 63-1 at 9.

Defendants' argument that Quinonez's complaint now appears unfounded does not insulate it from a finding of retaliation. *See Wallace v. Sparks Health System*, 415 F.3d 853, 858 (8th Cir. 2005) ("We are mindful that an employee must be shielded from retaliation for protected activity, even if a court eventually decides that the employee's complaints are without merit, as long as the employee reasonably believed the employer's conduct violated Title VII.").[8] At the same time, an employee cannot insulate herself from discipline by merely making a complaint. *See Kiel*, 169 F.3d at 1136 ("Although contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or

---

[8] Defendants do not deny that Quinonez's written statement alleging harassment and discrimination was protected conduct.

disrupting the workplace."). Giving Quinonez the benefit of all reasonable inferences, I find that a reasonable jury could conclude that Morel's failure to investigate the complaint in a prompt manner, consistent with PCI's written policy, is indicative of a retaliatory motive. *See McInerney v. United Air Lines, Inc.*, 463 F. App'x 709, 718 (10th Cir. 2011) (finding that facts could reasonably give rise to an inference of retaliatory motive where employee was terminated a month after filing a discrimination complaint that was never investigated).

With regard to other complaints of retaliatory termination, Quinonez has presented unverified statements and one EEOC charge involving complaints of race and/or national origin discrimination. She relies on the timing between the protected conduct and the employees' discharge to demonstrate defendants' retaliatory motive. Defendants argue that these complaints do not create an automatic inference of retaliation. Such "me too" evidence "depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). Courts have allowed "me too" evidence under Rule 404(b) to prove the defendant's motive or intent. *See Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1286-87 (8th Cir. 2008); *Buckley v. Mukasey*, 538 F.3d 306, 309 (4th Cir. 2008). This evidence is typically presented in the form of testimony from other employees and is neither *per se* admissible nor *per se* inadmissible. *See Mendelsohn*, 552 U.S. at 388. Factors to consider include: "(1) whether past discriminatory or retaliatory behavior is close in time to the events at issue in the case, (2) whether the same decisionmaker was involved, (3) whether the witness and plaintiff were treated in the same manner, and (4) whether the witness and plaintiff were otherwise similarly situated." *Hayes v. Sebelius*, 806 F. Supp. 2d 141, 144-45 (D.D.C. 2011) (citing *Nuskey v. Hochberg*, 723 F. Supp. 2d 229, 233 (D.D.C. 2010)).

I decline to decide the relevance or admissibility of this evidence at this time, as Quinonez does not need it to survive summary judgment on her retaliation claims. Giving

her the benefit of all reasonable inferences, I find the combination of evidence related to temporal proximity, the increased discipline and lack of prompt investigation to be sufficient for a reasonable jury to conclude that defendants' proffered reason for discharge was pretext for retaliation. Defendants' motion for summary judgment on the retaliation claims, Counts I and III, will be denied.

## D.    *Individual Liability As To Defendants Wood and Ehlenbach*

Defendants argue Wood and Ehlenbach must be dismissed from the case because they were not responsible for the termination of Quinonez's employment. They argue that Quinonez's only basis for holding them liable is her "suspicion" that Morel consulted with them regarding her employment status when he left to make a copy of her statement. They contend that this is insufficient to survive summary judgment.

Quinonez did not assert individual liability claims under Title VII and acknowledges that there is no individual liability under Title VII. *See, e.g.*, *McCullough*, 559 F.3d at 860 n.2. However, she argues that supervisory employees can be held individually liable for discrimination under the ICRA. With regard to Wood and Ehlenbach, she relies largely on the "cat's paw" theory, which provides that "an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." *Dedmon v. Staley*, 315 F.3d 948, 949 n.2 (8th Cir. 2003). "It is not necessary for the plaintiff to show that the biased subordinate made an express recommendation that the plaintiff be terminated or otherwise subjected to detrimental job action for 'cat's paw' liability to apply." *Coe v. N. Pipe Prods., Inc.*, 589 F. Supp. 2d 1055, 1091 (N.D. Iowa Dec. 2, 2008) (citing *E.E.O.C. v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 488 (10th Cir. 2006)). Quinonez argues that if a non-decisionmaker took adverse action against an employee with discriminatory intent and

his or her actions influenced the decision, a fact question is generated on the issue of discriminatory animus. *See* Doc. No. 50-4 at 50 (citing *Couch v. Iowa Dept. of Human Servs.*, No. 15-0432, 2016 WL 5930340, at *6 (Iowa Ct. App. Oct. 12, 2016)).

Quinonez argues a jury could find that Wood and Ehlenbach discriminated against her when they suspended her for the tape on her hard hat while allowing male workers to continue putting stickers and decals on their hard hats without consequence. She argues a jury could also find that they influenced Morel's decision to discharge her by telling him she was being insubordinate, but failing to inform him that she had accused them of discrimination and that she had refused to leave because she wanted to speak to HR. Quinonez cites her deposition testimony that she complained of discrimination and harassment to Wood and Ehlenbach before they met with Morel. *See* Doc. No. 50-2 at 22. She also cites Morel's testimony that Ehlenbach had reported his version of the situation to Morel, including the allegation that when they suspended Quinonez, she refused to sign the disciplinary form and leave the jobsite. *Id.*

The cat's paw theory does not apply here. First, as defendants note, the cat's paw theory is typically applied in direct evidence discrimination cases rather than indirect evidence cases under the *McDonnell Douglas* framework. *See Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1152 (8th Cir. 2011). Quinonez has not presented any direct evidence of discrimination. In addition, Ehlenbach and Wood were not subordinates with no decisionmaking ability. *See Qamhiyah v. Iowa State Univ.*, 566 F.3d 733, 742 (8th Cir. 2009) (explaining that the cat's paw theory applies to "a situation in which a biased subordinate, who lacks decision making power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action."); Doc. No. 63 at 21 (undisputed that Wood suspended Quinonez for three days). To the extent that Ehlenbach and Wood had decisionmaking authority, and exercised it in a discriminatory manner, they would be considered supervisory employees subject to individual liability under the ICRA, similar to Morel. *See Vivian v. Madison*, 601 N.W.2d 872, 878 (Iowa

1999) ("a supervisory employee is subject to individual liability for unfair employment practices under Iowa Code section 216.6(1) of the [ICRA]."). The cat's paw theory does not apply here to extend individual liability further.

It is undisputed that Wood suspended Quinonez "for putting unapproved colored tape on her hard hat." Doc. No. 50-2 at 17. As noted above, I find a jury could infer a discriminatory animus based on evidence that male employees were not disciplined in any way for wearing similar tape on their hard hats. Thus, Quinonez may continue to pursue an ICRA discrimination claim against Wood, individually, based on his decision to suspend her.

As for Ehlenbach, there is no evidence that he disciplined Quinonez in any way or influenced Morel's decision to terminate Quinonez's employment to the extent that Morel was merely a conduit for any discriminatory animus that Ehlenbach held. *See Liles*, 851 F.3d at 820 (finding plaintiff did not present sufficient evidence that one subordinate had sufficient influence over decisionmaker to cause him to fire plaintiff and had not produced evidence that other subordinate harbored a discriminatory animus). Because Ehlenbach cannot be held liable under a cat's paw theory or as the formal decisionmaker, I find that he is entitled to summary judgment.

## V. CONCLUSION

For the reasons explained herein, defendants' motion (Doc. No. 47) for summary judgment is **granted** as to Quinonez's claims against Ehlenbach. Defendant James Ehlenbach is hereby dismissed as a party to this action. The motion for summary judgment is **denied** in all other respects. This case will proceed to trial as scheduled beginning April 9, 2018.

**IT IS SO ORDERED.**

**DATED** this 20th day of December, 2017.

_____
Leonard T. Strand, Chief Judge